UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

BRENT JACOBY,

                        Plaintiff,

    vs.

                                    9:05-CV-1254

COUNTY OF ONEIDA, NEW YORK, et al.    (FJS/GJD)

                       Defendants.

_____

BRENT JACOBY, Plaintiff *Pro Se*
BARTLE J. GORMAN, ESQ., for Defendants

GUSTAVE J. DI BIANCO, United States Magistrate Judge

## ORDER and REPORT-RECOMMENDATION

      This matter has been referred to me for Report and Recommendation by the
Honorable Frederick J. Scullin, Jr., Senior United States District Judge pursuant to
28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

      In this amended civil rights complaint, plaintiff alleges that he was denied
appropriate medical and mental health care; that officers used excessive force against
him; that the Oneida County Jail had inadequate law library facilities; and that
defendants retaliated against plaintiff for filing grievances and an Article 78 petition.
Plaintiff seeks substantial monetary relief.  Amended Complaint ("AC")[1] at ¶ 158
(Dkt. No. 10).

      Presently before the court is plaintiff's motion for partial summary judgment

---

[1]The amended complaint is Docket Number 10.  The court will cite the amended
complaint only as "AC."

pursuant to FED. R. CIV. P. 56.[2] (Dkt. No. 59).  Defendants oppose plaintiff's motion, and have filed a cross-motion for summary judgment pursuant to FED. R. CIV. P. 56. (Dkt. No. 67).  Plaintiff filed a response to defendants' motion. (Dkt. No. 72).  While defendants were granted permission to file reply papers (Dkt. No. 75), it appears that no reply papers were filed.

**DISCUSSION**

1.    **Motion for Summary Judgment**

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact.  FED. R. CIV. P. 56; *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion."  *Id*.  However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  At that point, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial.  *Id*.

---

[2]The claims underlying plaintiff's motion for partial summary judgment are unclear.  He states, "I am only moving for partial summary judgment on (count 1, 2, 5, 6, and 7) because counts 3, 4, 8 and 9 have clear factual disputes that a Jury will have to decide.  Also am moving for partial summary judgment on (count 10) as well."  (Dkt. No. 59, Plaintiff's Decl, ¶ 1).  The beginning of plaintiff's amended complaint lists some sections as "claims," while the second part of the amended complaint lists the "Counts" upon which he bases the complaint.  Since plaintiff's motion for partial summary judgment refers to "Counts," this court will associate those "Counts" with the paragraphs in the second part of the complaint.  AC ¶¶ 87-158.

**2.**    **Background & Plaintiff's Claims**

Plaintiff was confined at the Oneida County Correctional Facility (OCCF) between May 2004 and February 2005 as a pre-trial detainee. (AC ¶ 2).  Plaintiff was released from OCCF in July of 2004 in order to attend a rehabilitation center, and was returned to OCCF in August of 2004. (AC ¶ 18). *See also* Stock Aff. Ex. B-1 and B-2 (Dkt. No. 67).  After his conviction, and his sentencing in January 2005, plaintiff was moved from OCCF, and is currently confined in Attica Correctional Facility (Attica). Stock Aff. Ex. B-4 (Dkt. No. 67).  Plaintiff filed this case in October 2005, and he filed the amended complaint in January 2006. (Dkt. Nos. 1 & 10).  The circumstances surrounding plaintiff's claims began in May 2004.

Plaintiff's amended complaint is thirty five pages long and contains 158 numbered paragraphs. (Dkt. No. 10).  Plaintiff has divided the amended complaint into two sections.  The first section appears to contain factual background, (AC ¶¶ 1-86), and the second part of the amended complaint contains the "Counts" upon which the amended complaint is based. (AC ¶¶ 87-158).  Unfortunately, the first part of the amended complaint also contains headings that plaintiff refers to as "Claims."  A review of the amended complaint shows that all of the "Claims" are included in some form in plaintiff's "Counts," thus, the court will confine itself to citing plaintiff's "Counts," together with the paragraphs of the factual portion of the amended complaint to which those counts refer.

**A.  Deliberate Indifference (Counts 1 & 2)(AC ¶¶ 87-97)**

Plaintiff claims two serious medical needs that staff at OCCF failed to

adequately address.  Plaintiff states that on his arrival at OCCF, he was placed on suicide watch. (AC ¶ 15).  Plaintiff claims that Dr. Kordylewska[3] diagnosed plaintiff with "manic depressive disorder with suicidal tendencies."[4] (AC ¶ 17).  Plaintiff claims that he was given medications to treat the disorder.  *Id*.  Plaintiff was sent to participate in a rehabilitation program at another facility in July 2004, and when he returned to OCCF, plaintiff claims that he was denied adequate psychiatric treatment. (AC ¶ 20).

Plaintiff alleges that he was denied his medications, and this "exacerbated the possibility of suicide and hampered the prospects of his mental health recovery . . . ." (AC ¶ 21).  Plaintiff claims that other mental health staff put in requests for plaintiff to be evaluated and to receive medications, but that all of the requests were ignored. (AC ¶ 23).  Plaintiff states that his medications were resumed in October 2004 after a judge and plaintiff's counsel called the jail to inquire about the medications. (AC ¶ 28).  Plaintiff claims that he wrote repeatedly to defendant Sheriff Middaugh, Undersheriff Paravati, and Lieutenant Heim regarding this issue, but was ignored. (AC ¶ 22).

Plaintiff also states that he requested treatment for a genital herpes outbreak in June 2004. (AC ¶ 52).  Plaintiff claims that he began submitting sick call requests on June 18, 2004 (AC, ¶ 49), but was not examined by a nurse until June 30, 2004 (AC

---

[3] The correct spelling of this defendant's name is "Kordylewska," and therefore, the court will utilize the proper spelling in this report.

[4] Plaintiff alleges that defendant "Yolla" was part of the psychiatric team that denied him care. (AC ¶ 17).  Defendant Sheriff Middaugh acknowledges that this defendant is Iola Idzi, an independent contractor who provides psychiatric nursing services at OCCF.  Middaugh Aff. ¶ 6.

¶ 52).  Plaintiff claims that he submitted numerous sick call requests and multiple complaints to defendants Nurse Coordinator Stock, Lieutenant Heim (Grievance Coordinator), Undersheriff Paravati, and Sheriff Middaugh. (AC ¶ 53).  Plaintiff claims that on July 1, 2004, plaintiff "began screaming out in pain, frustration and anger" to be treated by a doctor. (AC ¶ 54).  The plaintiff credits a nurse with arranging for plaintiff to see a doctor on July 1, 2004.  *Id*.  Plaintiff states that he was finally given medication and cream to treat the outbreak. (AC ¶ 54).  Plaintiff claims that defendants Nurse Stressel, Nurse Coordinator Stock, Undersheriff Paravati, Sheriff Middaugh, and "[t]he County, Medical Department" all showed deliberate indifference to plaintiff's serious medical needs. (AC ¶ 55).

### B.  Excessive Force (Count 4)(AC ¶¶ 103-105)

Plaintiff makes two separate claims of excessive force against defendant Officer Breen, and one claim of excessive force against defendant Heaney.  Plaintiff alleges that on August 15, 2004, Officer Breen used excessive force while escorting plaintiff to Pod 4. (AC ¶¶ 33, 104).  On that occasion, plaintiff claims that he was beaten in the hallway.  *Id*.  Plaintiff alleges that on September 19, 2004, Officers Breen and Heaney performed inappropriate strip searches of plaintiff, and interrogated plaintiff while he was naked. (AC ¶¶ 38-40).  Shortly thereafter, plaintiff alleges that Officers Breen and Heaney rushed into plaintiff's cell and beat him. (AC ¶¶ 43, 104).

### C.  Strip Searches and Deprivation Status (Count 5)(AC ¶¶ 106-108)

This claim appears to be related to the circumstances surrounding plaintiff's

excessive force claims.  Plaintiff claims that defendants Breen and Heaney "were the moving force behind the deliberate indifference towards Jacoby and his rights by intentionally keeping him nude, not giving him clothing, [or] a mattress and repeatedly doing visual body cavity searches."  (AC ¶ 107).  Plaintiff claims that defendants Sergeant Carey, Lieutenant Liddy, Sheriff Middaugh, and Undersheriff Paravati "were all aware of and or placed Jacoby on deprivation status."  (AC ¶ 108).

### D.  Duty to Protect (Count 3)(AC ¶¶ 97-102)

This claim appears to be more related to excessive force than to a "failure to protect."  Plaintiff claims that defendant Sergeant Carey "failed to protect" plaintiff "from the excessive force used on Jacoby" and violated plaintiff's rights by watching officers assault plaintiff and by allowing plaintiff to be deprived of clothing, a mattress, and other property. (AC ¶ 98).  Plaintiff alleges that defendants Sheriff Middaugh, Undersheriff Paravati, Lieutenant Heim, Dr. Kodylewska, and "Yolla" failed to protect plaintiff from harm that plaintiff inflicted upon himself.[5]  (AC ¶¶ 99-102).

### E.  Access to Courts (Count 6)(AC ¶¶ 109-13)

Plaintiff alleges that defendants Sheriff Middaugh and Undersheriff Paravati failed to provide the Oneida County Correctional Facility with adequate legal materials, books, and assistance. (AC ¶ 110).

### F.  Failure to Investigate (Count 7)(AC ¶¶ 114-19)

Plaintiff alleges that defendants Lieutenant Heim, Undersheriff Paravati, and

---

[5] This claim would be related to plaintiff's medical care claims, rather than a claim of "failure to protect."

Sheriff Middaugh failed to adequately investigate his many complaints and grievances. (AC ¶ 115).  Plaintiff also alleges that Lieutenant Liddy refused to supply plaintiff with the supplies and complaint forms in order for him to write more complaints and grievances. (AC ¶¶ 118, 122 (in Counts 7 & 8)).

### G.  Retaliation (Count 8)(AC ¶¶ 120-29)

Plaintiff claims that defendants Breen and Carey retaliated against plaintiff by harassing plaintiff and searching plaintiff's cell. (AC ¶ 121).  Plaintiff claims that defendant Liddy retaliated against him by placing plaintiff on deprivation status and preventing plaintiff from contacting "the courts." (AC ¶ 123).  Plaintiff states that defendant Lieutenant Heim retaliated against plaintiff by ignoring his grievances and complaints. (AC ¶¶ 126-27).  Plaintiff claims that defendants Sheriff Middaugh and Undersheriff Paravati retaliated against plaintiff by allowing officers to abuse plaintiff because plaintiff was "constantly writing them and for attempting to file a article 78 petition with the court." (AC ¶ 126).

### H.  Conspiracy (Count 9)(AC ¶¶ 130-49)

Plaintiff claims that defendants Carey, "Yolla", Dr. Kordylewska, Paravati, Liddy, and Middaugh "eventually got together with the grievance coordinator Lt. Heim they discussed how they could come up with lies and make up stories and write Jacoby a bunch of Disciplinary tickets to muddy the waters a bit and hide their faults and liability." (AC ¶ 132).  Plaintiff claims that this meeting of seven defendants was followed by more retaliation and disciplinary tickets. (AC ¶¶ 136-46).

### I.  Municipal Liability (Claim 10)(AC ¶¶ 150-58)

Plaintiff claims that it was the policy of Oneida County to "inadequately and improperly investigate citizen complaints or grievances." (AC ¶ 152).  Plaintiff alleges that Oneida County failed to adequately supervise and train its medical staff, mental health staff, and corrections officers. (AC ¶ 153).  Plaintiff claims that Oneida County did not provide adequate funding to the jail, or hire enough medical employees.  (AC ¶¶ 154, 157).  Plaintiff claims that the policies of Oneida County "were the cause of the violations of Jacoby's rights herein." (AC ¶ 156).

### F.  Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 59) and Defendants' Cross-Motion for Summary Judgment (Dkt. Nos. 67 & 68[6])

Plaintiff states that his motion for partial summary judgment is addressed only to Counts 1, 2, 5, 6, and 7. (Dkt. No. 59).  Plaintiff's motion includes the following claims: deliberate indifference to plaintiff's serious medical need (herpes outbreak) (Count 1), deliberate indifference to plaintiff's serious medical need (psychiatric care) (Count 2), unreasonable strip searches and deprivation status (Count 5), inadequate access to courts (Count 6), and the failure by officials to investigate plaintiff's letters, complaints, and grievances (Count 7).  Plaintiff argues that the remaining claims "have clear factual disputes that a Jury will have to decide."  (Dkt. No. 59, Plaintiff's Decl, ¶ 1).

In their cross-motion for summary judgment, defendants argue that all claims

---

[6]Defendants' Memorandum of Law for the Cross-Motion was submitted at Dkt. No. 68 separately from the supporting documentation at Dkt. No. 67.

as to all defendants[7] should be dismissed. (Dkt. Nos. 67 & 68).  Defendants argue that plaintiff has not exhausted his administrative remedies as to his access to courts claim.[8] (Dkt. No. 68 at 3).  Defendants argue that plaintiff cannot establish that defendants were deliberately indifferent to any serious medical need. (Dkt. No. 68 at 4).  Defendants argue that there was no excessive force, and that officers complied with policy.  (Dkt. No. 68 at 7).  Defendants argue that plaintiff has not alleged sufficient personal involvement by defendants Sheriff Middaugh, Undersheriff Paravati, Nurse Coordinator Donald Stock, Officer Jack Breen, and Lieutenant Heim. (Dkt. No. 68 at 6-7).  Finally, defendants argue that they are entitled to qualified immunity. (Dkt. No. 68, 9).

## 3.    **Medical/Mental Health Care**

In the context of a convicted inmate, the protection against cruel and unusual punishment arises from the Eighth Amendment. *See Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).  In order to establish a violation of the Eighth Amendment, the plaintiff must show that the defendants were "deliberately indifferent" to his serious medical needs. *Id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  The standard for deliberate indifference includes an objective component, requiring that

---

[7]It appears that defendants Dr. Kordylewska and "Yolla"/Iola Idzi were never served. *See* Dkt. No. 60 (Summons Reissued, Aug. 20, 2007), Dkt. No. 80 (Order to reissue summons, Dec. 7, 2007), and Dkt. No. 83 (Summons Returned Unexecuted, Feb. 28, 2008).

[8]Defense counsel refers to this claim as plaintiff's claim number 4.  In the "Facts" section of the complaint, plaintiff numbered the access to courts claim as number 4.  However, later in the complaint, in his list of ten "counts," plaintiff numbers the access to courts claim as "Count 6."  As stated above, the court will refer to plaintiff's "Counts" for clarity and particularly because he refers to the "Counts" in his motion for partial summary judgment.

the deprivation be "sufficiently serious." *Id.* (citing *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)).  The standard also requires that the official act with a "sufficiently culpable state of mind," where the official "knows of and disregards an excessive risk to inmate health or safety." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  Finally, the official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw that inference. *Id.*

However, plaintiff in this case was not a convicted inmate at the time of the incidents described in the amended complaint.  Plaintiff was a pretrial detainee.  The Eighth Amendment does ***not*** apply to pretrial detainees. *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996).  Instead, the rights of one who is not convicted are protected by the Due Process clause. *Id.*  Although the Supreme Court has not specifically articulated the duties of a prison official under the Due Process clause, the Second Circuit has held that the pretrial detainee's rights are "at least as great as those of a convicted prisoner." *Id.* (citing *City of Revere v. Massachusetts General Hospital*, 463 U.S. 239, 244 (1983); *Bryant v. Malfucci*, 923 F.2d 979, 983 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991)).

The court in *Weyant* stated that the custodian of a pretrial detainee may be found liable if the official denied treatment needed to remedy a serious condition and did so because of his deliberate indifference to that need. *Id.* (citing *Liscio v. Warren*, 901 F.2d 274, 276-77 (2d Cir. 1990)). *See also Cuoco v. Moritsugo*, 222 F.3d 99, 106 (2d Cir. 2000).  Mere negligence or even medical malpractice, without more, is

insufficient to rise to the level of a constitutional violation. *Cuoco*, 222 F.3d at 107.

It is also well established that as long as the treatment given is adequate, plaintiff's

disagreement with the treatment does not rise to the level of a constitutional

violation. *Chance*, 143 F.3d at 703.  However, malpractice may rise to the level of

deliberate indifference if it "involves culpable recklessness, i.e. an act or a failure to

act . . . that evinces 'a conscious disregard of substantial risk of serious harm.'"

*Cuoco*, 222 F.3d at 107 (quoting *Chance*, 143 F.3d at 703)(internal quotation marks

omitted)).

It has been held in certain circumstances that a physician can be deliberately

indifferent if he or she consciously chooses "'an easier and less efficacious'

treatment plan." *Id.* (citing *inter alia Williams v. Vincent*, 508 F.2d 541, 544 (2d Cir.

1974)).  The court in *Chance* stated that whether a course of treatment was the

product of sound medical judgment or deliberate indifference depended on the facts

of the case. *Id.*

In this case, plaintiff argues that the court should grant summary judgment on

both of his medical care claims.  Defendants cross-move for summary judgment on

the same claims.  This court finds that summary judgment may be granted for

defendants on one of plaintiff's medical care claims, but should be denied for both

sides on plaintiff's mental health care claim.

Plaintiff claims that on approximately June 18, 2004, he had a genital herpes

outbreak and that he completed a sick call slip to be seen by a nurse. AC ¶ 49.

Plaintiff alleges that he subsequently had another outbreak and submitted another

sick call slip on June 23, 2004. AC ¶ 50.  Plaintiff claims that he wrote complaints to defendants Heim, Middaugh, Stock, and Paravati because "the outbreaks were spreading quick and he was in pain." *Id.*  Plaintiff alleges that two or three days later, he had another outbreak. AC ¶ 51.  As a result of this last outbreak, plaintiff states that he continued to "put sick calls in daily" as well as complain to the above supervisory defendants. *Id.*

Plaintiff states that he was finally examined by defendant Nurse Stressel on June 30, 2004. AC ¶ 52.  Plaintiff claims that defendant Stressel told plaintiff that he would not see a doctor or get any medications for herpes because "policy says no." *Id.*  Plaintiff states that defendant Stressel's actions amounted to deliberate indifference. *Id.*  Plaintiff states that he submitted over thirty complaint forms and seven sick call slips. AC ¶ 53.  Plaintiff alleges that on July 1, 2004, he was screaming in pain and frustration when Officer Brother took plaintiff's complaint form directly to Nurse Addington, who obtained treatment for plaintiff. AC ¶ 54.

Plaintiff alleges that these actions constituted deliberate indifference by defendant Stressel and showed that Oneida County's policies regarding the provision of medical care for its inmates were constitutionally inadequate. AC ¶ 55.  Plaintiff alleges that the "Department" ignores inmates medical needs because OCCF is so "grossly understaffed" that it cannot possibly provide adequate medical care. *Id.*

In "Count 1" of the amended complaint, plaintiff alleges that defendants Middaugh, Paravati, and Stock did not properly investigate plaintiff's complaints, that defendants Middaugh and Paravati failed in their duty to manage the day-to-day

operations of the jail, and that defendant Stock is responsible as the Medical Coordinator for executing the medical policies to make sure that all inmates get proper medical care. AC ¶¶ 88-90.  Plaintiff claims that defendant Stressel was deliberately indifferent because she failed to refer plaintiff to a doctor for treatment of the herpes outbreak. AC ¶ 91.

Defendants Stock and Stressel have submitted affidavits in support of their motion for summary judgment on the herpes claim. (Dkt. No. 67).  Defendant Stock is the Nurse Coordinator at OCCF. Stock Aff. ¶ 3.  In his affidavit, defendant Stock outlines the procedure by which inmate request medical services. Stock Aff. ¶ 5.  In order to request medical care, the inmate completes a "sick call slip" and puts the slip in a locked box in his housing unit. *Id.*  The slips are then collected by the nurse or medical officer during the morning medication rounds, and the requests are then logged into the "sick call log book." *Id.*  A nurse, assigned to sick call, then reviews all the slips. *Id.*  Defendant Stock has submitted a copy of the sick call log book for June 14, 2004 through July 14, 2004. Stock Aff. Ex. A.

Defendant Stock has also produced plaintiff's "location history" for his stay at OCCF. Stock Aff. Ex. B.  This record shows that plaintiff was examined and "cleared medically" on June 24, 2004.  Although plaintiff submits sick call slips dated June 19 and June 24, 2004, these slips do not appear in the sick call log book. Stock Aff. Ex. A.  However, on June 28, 2004, the sick call log book indicates that plaintiff submitted *four* sick call slips at once. *Id.* at A-6.  Plaintiff also submitted three sick call slips on June 30, 2004. *Id.* at A-8.

Defendant Stressel states that she examined plaintiff on June 30, 2004, a statement that is confirmed by plaintiff's own exhibits. Stressel Aff. ¶ 7; Plaintiff's Exhibits at p.6.  Nurse Stressel's notes indicate that plaintiff was using hydocortisone cream for the itching, and she advised him to continue using the cream. Plaintiff's Exhibits at p.6.  In her affidavit, defendant Stressel states that she is unable to prescribe medication, but that she "placed [plaintiff's] complaint and [her] narrative in the doctor's intake." Stressel Aff. ¶ 7.  Plaintiff was seen by the doctor *the next day* and was given his prescription for Valtrex. Stressel Aff. ¶¶ 7, 9 & Plaintiff's Exhibits at p.7.  Plaintiff's own exhibit is an examination record, dated July 1, 2004 with a prescription for Valtrex. *Id.*  Plaintiff was again prescribed Valtrex for an outbreak on October 6, 2004. Plaintiff's Exhibits at p.18.

Plaintiff has not shown that Nurse Stressel or Nurse Coordinator Stock were deliberately indifferent to plaintiff's serious medical needs.  Nurse Stressel states that she cannot prescribe medication, and that the doctor was not on duty on June 30, 2004. Stressel Aff. ¶ 7.  Plaintiff was using his cream, and defendant Stressel told him to keep using it. *Id.*  The doctor only comes to the facility twice per week. *Id.* On July 1, 2004, plaintiff was prescribed his medication. *Id.*

Plaintiff submits additional complaints that he filed during this time period. The court notes that plaintiff was still submitting complaints *after* he had been examined *by both an nurse and the doctor and had already been prescribed medication by the doctor*. Plaintiff's Exhibits at 10, 11.  One of these exhibits is dated July 1, 2004 and the other is dated July 4, 2004. *Id.* It is unclear who signed the

"response" to these "Informal Complaints."  Defendant Stock states that the signatures are not his and disputes the authenticity of the documents. Stock Aff. ¶ 8. Even assuming that these documents are authentic, they would only show that plaintiff was continuing to complain even *after* he had been examined by Nurse Stressel on June 30 and *after* he had been prescribed the medication that he wanted on July 1, 2004.  Defendant Stock was not involved in plaintiff's case at a time where he could have remedied anything since plaintiff's problem had already been addressed, and there is no evidence that he was deliberately indifferent to plaintiff's serious medical needs.

The fact that plaintiff continued to write complaints does not make defendants' conduct deliberately indifferent when plaintiff had already been examined and the medication had already been ordered.  As Nurse Stressel's June 30, 2004 note states, Herpes is a chronic problem for which there is no cure. Plaintiff's Exhibits at p.6, 8. At worst, plaintiff disagreed with Nurse Stressel's assessment and advice.  As stated above, plaintiff's disagreement with the care he received does not rise to the level of a constitutional violation. *Cuoco*, 173 F.3d at 703.  There is no evidence to show that defendants were deliberately indifferent to a serious medical need, and defendants are entitled to judgment as a matter of law with respect to plaintiff's herpes complaint.  Since Nurse Stressel's and Nurse Coordinator Stock's only contact with plaintiff was the herpes examination, the amended complaint may be dismissed *in its entirety* as to Nurse Stressel and Nurse Coordinator Stock.

Plaintiff also claims that the defendants were deliberately indifferent to his

15

mental health needs. Plaintiff claims in Count 2 of the amended complaint that defendants "Yolla" and Margaret Kordylewska were deliberately indifferent to his psychiatric needs because they failed to provide plaintiff with his medications when he returned to OCCF in August of 2004 and did not give him adequate care after he attempted suicide. AC ¶ 94. Plaintiff also claims that defendants Middaugh and Paravati failed to adequately investigate plaintiff's complaints regarding this matter. Plaintiff moves for summary judgment on this issue.

Defendants do not address this issue in their memorandum. However, defendant Middaugh states that mental health services are provided to inmates at OCCF by "Central New York Services as independent contractors." Middaugh Aff. ¶ 6. Defendant Middaugh then states that defendants Dr. Margaret Kordylewska and Nurse Iola Idzi "are not employees of Oneida County." *Id.* Defendant Middaugh further states that he is aware that plaintiff filed a complaint with the New York State Commission of Corrections regarding the delivery of mental health services, however the "policies and procedures with regard to mental health services are not issued by the Office of the Sheriff." Middaugh Aff. ¶ 7.

Plaintiff has filed the response from the Commission of Corrections regarding his claims, including his mental care claim. Plaintiff's Exhibits at 32-33. The letter is addressed to Sheriff Middaugh, and essentially finds that Dr. Kordylewska "indiscriminately and purposefully withheld" plaintiff's medications, resulting in a suicide attempt by plaintiff. *Id.* As an exhibit to his affidavit, defendant Middaugh submits Dr. Kordylewska's January 26, 2005 response to the Commission of

Corrections findings. Middaugh Aff. ¶ 7 & Ex. A.  The letter starts by stating that although her name was cited as providing inappropriate care, there had been "no effort . . . made to obtain [her] input." *Id.* at 1.  Dr. Kordylewska then detailed the reasons for her treatment of plaintiff, including that plaintiff had no past mental health treatment, and even the doctors at the Central New York Psychiatric Center[9] found that no medication was advised. *Id.* at 1-3.

In plaintiff's exhibits, he submits the response to his grievance by defendant Lieutenant Helen Heim, OCCF Grievance Director. Plaintiff's Exhibits at 25.  In defendant Heim's response, she states that "Mental Health" prescribed plaintiff medication when he was first incarcerated, but that after he was returned to the facility in August, he was seen intoxicated several times, and he was caught with another inmate's medication, thus "Mental Health" put "a hold" on plaintiff's medication to prevent any interaction between Drugs and Alcohol. *Id.*  The court understands that defendant Kordylewska did not begin treating plaintiff until August, however, in her letter to the Commission, there is no discussion of plaintiff's prior prescriptions or the decision to withhold them and why.  Thus, this court finds that there are questions of fact to be resolved regarding plaintiff's mental health care, and will not recommend summary judgment on this issue.

As stated above, defendants do not address this issue in their motion except to state that "it is undisputed that the Oneida County Jail provided mental health care as

---

[9] Plaintiff was sent to the Central New York Psychiatric Center (CNYPC) on October 26, 2004 for making suicidal statements and cutting his wrist "superficially." Middaugh Aff. Ex. A at 2.  Dr. Kordylewska states that she had nothing to do with the transfer to CNYPC. *Id.*

an essential service." Def. Mem. of Law at 6.  This statement certainly does not show that there is no issue of material fact regarding plaintiff's mental health care, given all the other documents of record.

The court does note that defendants Dr. Kordylewska and Nurse Idzi have not yet been served in this action, and plaintiff's mental health claims are addressed to these defendants.[10]  Summonses have been re-issued approximately **six times** for defendants Kordylewska and Idzi.  It is unclear why these defendants have not been served since defendant Kordylewska's address appears on her letter to the Commission of Correction, and this is the same address used most recently to attempt service by mail. Middaugh Aff. Ex. A & Dkt. No. 83.  This court will order the Marshal to personally serve defendant Kordylewska.

With respect to defendant Idzi, however, the court notes that plaintiff never really makes any claims against this defendant.  In the amended complaint, defendant Idzi is referred to as Jane Doe or Yolla. AC ¶ 17, 24, 27.  Plaintiff states that defendant Idzi gave him medication to treat his "manic depressive disorder," shortly after he was admitted to OCCF in May of 2004. AC ¶ 17.  Plaintiff claims that when he was returned to OCCF in August of 2004, he was seen by Dr. Kordylewska and

---

[10] Defendant Middaugh states in his affidavit that Dr. Korylewska and Iola Idzi are "not employees of Oneida County" and that "they were provided by Central New York Services to address mental health issues." Middaugh Aff. ¶ 6.  The court would point out that a municipality with the responsibility for providing medical attention to inmates held in its custody may make an independent contractor rendering such services a state actor within the meaning of section 1983. *Burgess v. County of Rennselaer,* 03-CV-652, 2006 U.S. Dist. LEXIS 91521, *8-15 (N.D.N.Y. Dec. 14, 2006). *See also West v. Atkins*, 487 U.S. 42, 57 & n.15 (1988) (private medical personnel who are employed by th estate to provide medical services to inmates act under color of state law for purposes of section 1983).

Idzi, but was denied "adequate psychiatric treatment" because "they" did not give plaintiff medication. AC ¶ 20. However, plaintiff also states that on October 13, 2004, defendant Idzi told plaintiff that she would consider giving plaintiff his medications, but would have to get it approved. AC ¶ 24. Finally, plaintiff states that on October 16, 2004, defendant Idzi gave plaintiff his medications. AC ¶ 27.

Defendant Middaugh states that Iola Idzi is a mental health nurse. Middaugh Aff. ¶ 7. Clearly Dr. Kordylewska is a physician and dealt with plaintiff's case directly. From Dr. Kordylewska's letter it appears that *she* made the decisions regarding plaintiff. Thus, this court will only order service on Dr. Kordylewska and will recommend dismissing the case as against Iola Idzi based on failure to state a claim against her.

## 4.   Excessive Force and Failure to Protect[11] (Counts 3 & 4)

As stated above, plaintiff's constitutional protection as a pretrial detainee arises under the Due Process Clause. *Gashi v. County of Westchester*, 02 CV 6934,

---

[11] The court notes that plaintiff claims a "failure to protect" against defendant Carey for failing to protect plaintiff from the alleged assault by the other officers. In order to establish a "failure to protect," which is generally claimed when an inmate has been assaulted by another inmate, the plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, ***and*** prison officials acted with deliberate indifference to that risk and the inmate's safety. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). The plaintiff must show that prison officials ***actually knew of and disregarded*** an excessive risk of harm to the inmate's health and safety. *Id.* at 837. The defendant must be aware of the facts from which the inference can be drawn that a substantial risk of serious harm exists and the defendant must also draw that inference. *Id.* Plaintiff's claim in this case, is more properly one of excessive force against the defendants and plaintiff may claim that defendant Carey did not ***intervene*** to prevent the excessive force. Thus, the court will consider this claim as one of excessive force and not of a failure to protect. Plaintiff also states that defendants did not protect plaintiff from himself. Again, this claim is not a "failure to protect," rather it is related to his mental and medical health care claims that have been discussed above.

2007 U.S. Dist. LEXIS 19789, *13-14 (S.D.N.Y. March 12, 2007).  Courts have held that the same legal standard applies to claims under the Fourteenth Amendment as applies under the Eighth Amendment. *Id.*

When the use of excessive force is alleged under the Eighth Amendment standard, the court must determine whether the force "was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitely v. Albers*, 475 U.S. 312, 320-21 (1986)(quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied*, 414 U.S. 1033 (1973)).  In order to meet the constitutional standard for excessive force, the defendants' conduct must be "'inconsistent with the contemporary standards of decency' and 'repugnant to the conscience of mankind.'"*Whitely*, 475 U.S. at 327.

There is an objective and a subjective prong to the Eighth Amendment analysis. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991).  The objective prong is satisfied when plaintiff shows that the deprivation was "sufficiently serious," and the subjective prong is satisfied by showing that defendants had a "wanton state of mind." *Griffin v. Crippen*, 193 F.3d 89, 91 (2d Cir. 1999).  Minor uses of physical force do not reach the constitutional level as long as the force used is not "repugnant to the conscience of mankind." *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992).

The court must determine the need for the force, the relationship between the need and the amount of force used, the extent of the injury suffered, the extent of the threat to the safety of staff and inmates, and any efforts made to temper the severity of a forceful response. *Whitely*, 475 U.S. at 321.  An excessive force claim may be

established even where plaintiff does not suffer a serious or significant injury, provided that the use of force was more than "de minimis." *Gashi v. County of Westchester*, 2007 U.S. Dist. LEXIS 19789, at *14-15 (citing *United States v. Walsh*, 194 F.3d 37, 47-48).

Plaintiff alleges that on August 15, 2004, he was moved to a protective custody housing unit because plaintiff was seen speaking to a co-defendant. AC ¶ 33. Plaintiff alleges that defendant Carey ordered the move, and that defendant Breen and Todd Woodland[12] came to escort plaintiff to the new unit. *Id.* Plaintiff claims that on the way to the protective custody unit, he and defendant Breen exchanged some harsh words, and defendant Breen "slammed" plaintiff to the ground, and kneed him in the sides, back and shoulders, while twisting his arms in "dangerous angles." AC ¶ 33. Plaintiff claims that he was issued a disciplinary ticket, but found not guilty of two of the charges. AC ¶¶ 34-35. Plaintiff claims that defendants Carey, Breen, and Officer Woodland fabricated the charges to cover up the assault by defendant Breen. AC ¶ 36.

In a separate incident, on September 19, 2004, plaintiff claims that his cell was the subject of a search[13] by defendants Breen, Heaney, and Officer Palcovic.[14] AC ¶ 38. After the search, plaintiff claims that he was intimidated and later assaulted again by defendants Carey, Heaney, and Breen. AC ¶¶ 39-43. Plaintiff claims that

---

[12] Todd Woodland is not a defendant in this case.

[13] Plaintiff challenges the search in another claim.

[14] This officer is not a defendant in this case.

defendant Heaney dug his knees into plaintiff's head, trying to smash his head into the floor, and defendant Breen hit plaintiff in the sides and twisted his arms. AC ¶ 43.  Plaintiff also claims that defendant Breen hit plaintiff in the eye with his fist. *Id.* Plaintiff claims that he was dragged, naked, into a strip cell and slammed into the wall and a desk along the way.

Plaintiff claims that he wrote to defendants Middaugh, Paravati, and Heim about the assault and that defendant Heim finally came to see plaintiff about his complaints, but that her eventual response was full of lies.  Plaintiff alleges that he was charged with disciplinary violations and later found guilty. AC ¶ 46. Defendants Breen, Carey, and Heaney have submitted affidavits in support of their motion for summary judgment on the issue of excessive force.  Defendants claim that whatever force was used on plaintiff during both incidents was only that necessary to subdue plaintiff who was acting in a threatening manner.

### A.  August 15, 2004

Defendant Breen submits an affidavit stating that he and Officer Woodland had been assigned to escort plaintiff to POD4. Breen Aff. ¶ 3.  The incident reports and documents associated with the incident are attached as Exhibit A of the Breen Affidavit.  A review of the incident report, written by Officer Woodland, shows that while plaintiff was being escorted to the new housing unit, he began yelling, dropped his bin, and "raised his hands in an aggressive manner as he turned toward Officer Breen." Breen Aff. Ex. A-1.  Officer Woodland states that he and Officer Breen then "took the inmate to the ground," placed wrist restraints on him, assisted plaintiff to

his feet, and continued to escort him to the new unit without incident. *Id.*

In a section of the report written by defendant Carey (the supervisor), he states that after the incident, Medical Officer J. Heaney[15] was instructed to evaluate plaintiff, and Officer Heaney determined that plaintiff "appeared uninjured and did not complain of injury." *Id.* at A-2.  Defendant Heaney states in his affidavit that he was "not involved in the claim of excessive force on August 15, 2004. Heaney Aff. ¶ 2.  Plaintiff does not claim otherwise.  Oddly, defendant Heaney does not mention that he evaluated plaintiff on August 15, 2004 and found no injuries.  Plaintiff's "Location History," attached to defendant Stock's affidavit states that plaintiff was "cleared" by "medical" on August 15, 2004 after a transfer to another unit due to a "keep separate (KS) order". Stock Aff. Ex. B-2.

In plaintiff's response in opposition to the defendants' motion for summary judgment, he argues that there are questions of fact to be decided with respect to the claims of excessive force. (Dkt. No. 72).  In his response, plaintiff attempts to point out inconsistencies in defendant Breen's recitation of the facts of the August 15, 2004 incident.  Plaintiff filed a grievance regarding the incident that was investigated by defendant Heim.  Defendant Breen responded to the inquiries by submitting a memorandum, in which he explained that as plaintiff turned around, he struck defendant Breen with his elbow. (Dkt. No. 72, Pl. Ex. C at p.1).  Plaintiff claims that defendant Breen has never made this allegation in any of the other papers, and that this shows that defendant Breen is fabricating facts in order to justify his

---

[15] Apparently defendant Heaney is also the Medical Officer.

unconstitutional actions.

This slight difference in the facts is not "material" to this issue.  It is clear that there were no injuries as the result of the August 15, 2004 incident, and plaintiff did not request any medical assistance.  Thus, plaintiff's excessive force claims for the August 15, 2004 incident may be dismissed.

**B.  September 19, 2004**

Plaintiff submits a medical report, apparently dated September 20, 2004, indicating that plaintiff "states he was involved in an altercation with Deputies on 9/19/04." (Dkt. No. 72, Pl. Ex. H).  The medical provider states that although there were some slight abrasions and old bruises, there were "[n]o other marks, bruises, or swollen areas discovered." *Id.*  Essentially, the report indicates that plaintiff had no injuries as a result of the September 19, 2004 "altercation" with defendants.

Plaintiff alleges that the report is dated 9/**26**/04, and shows that he had to wait a week to be seen by the medical department.  Although the court notes that the report is clearly dated 9/**20**/04 at the top, it is unclear because the date at the bottom of the report looks like 9/26/04, and the narrative part of the report is also unclear as to the date.  The date of the report is important.  If plaintiff was examined the day after the alleged altercation and had absolutely no injuries, that could be evidence that the force used was not excessive.  However, if plaintiff had to wait one week to be examined, any bruises that he might have had could have begun to heal.  This issue raises a material question of fact regarding the extent of the force used on September 19, and the court will not recommend that summary judgment be granted

on that issue.

### 5.    <u>Strip Searches and Deprivation Status (Count 5)</u>

Because plaintiff was a pretrial detainee during his confinement in OCCF, his challenge to the conditions of his confinement arise under the substantive component of the Due Process Clause of the Fifth Amendment[16] and not from the cruel and unusual punishment standards of the Eighth Amendment. *Iqbal v. Hasty*, 490 F.3d 143, 168 (2d Cir. 2007).  Because the pretrial detainee has not been convicted, he may not be "punished" in any manner. *Id.*  Courts that consider challenges to conditions of confinement by pretrial detainees must first consider whether the circumstances of the particular confinement rendered the confinement "punitive." *Id.* In doing so, the court must keep in mind that some restraint is necessary, and thus, not all uncomfortable conditions are necessarily, punitive. *Id.* (citing *Benjamin v. Frasier*, 343 F.3d 35, 49 (2d Cir. 2003)).

In *Iqbal*, the court cited *Bell v. Wolfish*, 441 U.S. 520, 537-38 (1979) as the "seminal case on the substantive due process claims of pretrial detainees." 490 F.3d at 168.  In *Bell*, the Court discussed the factors that were relevant in determining whether a condition of confinement was punitive. 441 U.S. at 537-38.  These factors include

> whether the sanction involves an affirmative disability or restraint; whether it has historically been regarded as a punishment; whether it comes into play

---

[16] Plaintiff in *Iqbal* was suing federal defendants under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). 490 F.3d at 149.  Thus, the "Due Process" clause applicable to a *Bivens* case would be from the Fifth Amendment, whereas the "Due Process" clause applicable to a section 1983 claim would be the Fourteenth Amendment.  The analysis is the same, regardless of the source of the due process.

only on a finding of scienter, whether its operation will promote the traditional aims of punishment – retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned . . . .

*Id.* The court may infer that a condition of confinement is punitive if it is not reasonably related to a legitimate governmental objective. *Id.*

While it is true that the constitutional rights of inmates are restricted, the Fourth Amendment still requires that all searches conducted in a prison, including strip searches, to be reasonable. *Jean-Laurent v. Wilkinson*, 438 F. Supp. 2d 318, 323 (S.D.N.Y. 2006). In making this determination, the court must consider the scope of the intrusion, the manner in which it was conducted, the reason for initiating the search, and the place in which it was conducted. *Id.* (citing *Bell*, 441 U.S. at 559). A strip search may be unconstitutional if it is unrelated to any legitimate penological purpose or it is designed to intimidate, harass, or punish. *Id.* (citing *Covino v. Patrissi*, 967 F.2d 73, 80 (2d Cir. 1992).

In this case, plaintiff alleges that defendants Heaney and Breen conducted improper cell searches and repeated visual body cavity searches of plaintiff. Plaintiff claims that before the September 19, 2004 assault, defendants Breen and Heaney and Officer Palcovic[17] searched plaintiff's cell. AC ¶ 38. Plaintiff states that although no contraband was found, defendants performed a visual body cavity search, took plaintiff to the infirmary and made him take off his clothing again. *Id.* Plaintiff

_____

[17] As stated above, this officer is not a defendant.

concedes that he was found with another inmate's medication in plaintiff's shoe.[18]

Plaintiff claims that defendants then took his clothing and interrogated him while he was naked. AC ¶¶ 38-39.  Plaintiff claims that these defendants then took everything out of plaintiff's cell, leaving plaintiff naked with nothing in his cell. Plaintiff states that he was left naked for two hours. AC ¶ 42.  Later, plaintiff claims that he was assaulted by defendants Carey and Heaney, placed in a "strip cell" and given only a blanket. AC ¶ 43.

Although some of the strip searches may have been related to legitimate penological interests, there is still a question of fact regarding how plaintiff was treated when he was incarcerated at OCCF.  From reading the array of documents submitted in conjunction with these motions, it does appear that some of the treatment plaintiff received was justified[19], however, it is not for this court to make factual or credibility determinations, and there are simply too many questions regarding the circumstances surrounding plaintiff's claims to recommend granting summary judgment on this issue.

Plaintiff claims that in November of 2004, he was subjected to cell searches

---

[18] Plaintiff states that he explained to the officers that he was purchasing medications from other inmates because the medical staff had stopped giving plaintiff his medications. AC ¶ 38.

[19] Plaintiff concedes in some instances that he argued with the defendants and threatened suicide. *See e.g.* AC ¶ 68 ("Jacoby and Carey had 'unkind' words to each other and started arguing). Plaintiff also states in his complaint that he explained to the officers that plaintiff was "buying" medications from other inmates in exchange for food because the jail had stopped giving plaintiff his medications. AC ¶ 38.  The court is not making any judgments regarding the merits of these issues, it is merely finding that there are questions of fact precluding summary judgment for either side.

for one week and was given disciplinary tickets for anything possible. AC ¶ 73.

Plaintiff claims that these searches were done for no reason other than "punishment."

AC ¶ 73.  Plaintiff claims that defendant Carey ordered searches "as retaliation" from

December 3, 2004 until December 6, 2004. AC ¶ 75.  Plaintiff states that he was

placed on deprivation status on December 6, 2004 "for no reason." AC ¶ 76.

Plaintiff claims that he was kept in deprivation with no clothing or property, other

than a "bare mattress and a suicide suit." AC ¶ 77.  Plaintiff states that he was in

deprivation status for "about 30 days." AC ¶ 81.  Plaintiff claims that his status was

never reviewed and that he was kept on deprivation status "out of spite and

retaliation." AC ¶ 81.

　　　　Plaintiff challenges the "whole deprivation policy." AC ¶ 82.  Plaintiff

complained about this policy to the Commission of Corrections, and on February 3,

2005, Chairman/Commissioner Alan Croce wrote to defendant Middaugh stating that

as a result of plaintiff's complaint, an investigation had been conducted into the

deprivation status policy. (Dkt. No. 59)(Plaintiff's Ex. U).  Commissioner Croce

attached the investigative report, which found that plaintiff was denied "essential

services", and that the facility may not use the deprivation of these essential services

"as a form of punishment," even if the inmate had been found guilty in a disciplinary

hearing. Plaintiff's Ex. U at p.2.

　　　　In her affidavit, defendant Liddy states that a "revision" of the policy was

provided to the Commission on Corrections, but that even the revision was rejected,

and thereafter, the use of deprivation status orders was discontinued. Liddy Aff. ¶ 6.

Plaintiff was on deprivation status at various times during his incarceration at OCCF. Defendant Liddy states that it was her decision to "reclassify" plaintiff to deprivation status on December 6, 2004. Liddy Aff. ¶ 2.  In addition to the December 6, 2004 order, plaintiff was placed on deprivation status on September 19, 2004 after tattoo equipment was discovered in his cell and prescription drugs belonging to another inmate were found in plaintiff's shoe.  Plaintiff's Ex. at p.25 (memorandum from defendant Heim to plaintiff), 35-40.  Plaintiff was also placed on what was referred to as "strip status," allegedly because he threatened to hurt himself or others. Plaintiff's Exhibits at p.42-43 (dated 10/21/04).  Plaintiff claims that defendants actions were "punishment" and were designed to harass and intimidate him.  Based on the present record, this court will recommend denying plaintiff's motion for summary judgment on this issue.

**6.   Qualified Immunity**

Defendants did not move for summary judgment on the merits of the strip search and deprivation issue.  They argue, instead, that they are entitled to qualified immunity for their actions because they were acting pursuant to the policy as they had been "trained."  The doctrine of qualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Lipton v. County of Orange*, 315 F. Supp. 2d 434, 460 (S.D.N.Y. 2004).

Since this court has found that there is a question of fact regarding whether

29

defendants were using the deprivation status as punishment, and/or retaliating against plaintiff for his complaints, the court will not recommend granting summary judgment based on qualified immunity. Retaliation for the exercise of a constitutional right has never been reasonable. *Id.* Additionally, even if there existed a deprivation "policy," the fact that defendants were acting pursuant to an unconstitutional policy does not mean that they were not violating a "well-established" right. The treatment of pre-trial detainees has been established since *Bell v. Wolfish, supra,* whether with respect to the medical care claim or the deprivation of essential services. Thus, this court will not recommend granting summary judgment for defendants on these issues based on qualified immunity.

**6.    Access to Courts**

Plaintiff claims that the OCCF had inadequate law library facilities and assistance. Defendants argue that plaintiff did not exhaust his administrative remedies with respect to this claim. This court need not reach the exhaustion issue because, regardless of whether plaintiff exhausted his administrative remedies, he has not stated a claim for denial of access to courts.

In *Bounds v. Smith*, 430 U.S. 817 (1977), the Supreme Court held that access to the courts is a fundamental right that requires prison authorities to "assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." The Supreme Court has also held that an inmate alleging a denial of access to courts must show ***actual injury*** as a result of the deficient access to courts. *Lewis v. Casey*, 518

U.S. 343 (1996). The *cause of the injury* must be inadequacy of the access. *Id.* at

351. Plaintiff must show that a non-frivolous legal claim was frustrated or impeded

due to the actions of prison officials. *Warburton v. Underwood*, 2 F. Supp. 2d 306,

312 (W.D.N.Y. 1998)(quoting *Lewis v. Casey*, 518 U.S. at 353).

In this case, the amended complaint does not allege any injury resulting from

the deficient access to courts. Plaintiff seems to claim that if he had proper access to

the law library in general, he would have been able to get his medications and obtain

release from deprivation status. He claims that he was unable to fill out forms due to

his inadequate access to the law library and to proper assistance. He does not state

how access to the law library would have helped him fill out forms. Plaintiff simply

has not alleged sufficient injury to sustain an access to courts claim. Thus, plaintiff's

Count 6 may be dismissed *as against all defendants*.

**7.    Failure to Investigate Grievances**

Plaintiff claims that defendants Heim, Paravati, and Middaugh failed to

adequately investigate plaintiff's complaints. Defendants claim that these defendants

were not "personally involved" in plaintiff's alleged constitutional violations. First,

the law is clear that plaintiff has no constitutional right to have his grievances

processed at all, or if processed, to have the procedure done properly. *Torres v.*

*Mazzuca*, 246 F. Supp. 2d 334, 342 (S.D.N.Y. 2003). A violation of the inmate

grievance procedures does *not* give rise to a claim under section 1983. *Cancel v.*

*Goord*, No. 00-Civ. 2042, 2001 U.S. Dist. LEXIS 3440 (S.D.N.Y. Mar. 29, 2001).

Thus, to the extent that plaintiff alleges that grievances were not processed or were

not processed properly, whether by defendant Heim or by defendants Paravati or Middaugh, the complaint may be dismissed.

## 8.   <u>Respondeat Superior and Municipal Liability</u>

It is also true that personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and that *respondeat superior* is an inappropriate theory of liability. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)(citation omitted); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003).  In *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.  A supervisory official is said to have been personally involved if that official directly participated in the infraction.  *Id*.  A supervisory official is said to have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong.  *Id*. Personal involvement of a supervisory official is said to exist if he or she created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue.  *Id*.  Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event.  *Id*.

The above case law is applicable to a consideration of whether the supervisory officials would be liable ***individually*** for damages in a section 1983 action.  With respect to holding these individuals liable in their ***official*** capacity and thus,

establishing municipal liability[20], or suing the municipality itself as plaintiff has also done, plaintiff would have to show that the allegedly unconstitutional conduct resulted from a "policy" or "custom" of the municipality. *Anthony v. City of New York*, 339 F.3d 129, 139 (2d Cir. 2003).

When a claim against a municipality is based upon actions of subordinates such as in this case, municipal liability will be determined by plaintiff's ability to attribute the officer's conduct to the actions or omissions of higher ranking officials with policymaking authority. *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004).

One method of attributing conduct to the municipality is for plaintiff to show that the policymaker was aware of the subordinates' unconstitutional actions and consciously chose to ignore them, effectively ratifying the actions. *Id.* (citing *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870-71 (2d Cir. 1992)). Thus, where the policymaking official shows "deliberate indifference" to constitutional violations caused by subordinates, such that the official's actions rise to the level of a "deliberate choice", then that acquiescence may be considered the municipality's policy or custom that is actionable under section 1983. *Id.* (citing *City of Canton Ohio v. Harris*, 489 U.S. 378, 388 (1989); *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995); *Jeffes v. Barnes*, 208 F.3d 49, 63 (2d Cir. 2000)(holding that a sheriff's acquiescence in unconstitutional retaliation could be

---

[20] An ***official capacity*** suit is essentially a suit against the municipality by which the individual is employed. A section 1983 action against municipal officers in their official capacity is treated as an action against the municipality itself. *Coon v. Town of Springfield*, 404 F.3d 683, 687 (2d Cir. 2005)(citing *Brandon v. Holt*, 469 U.S. 464, 471-73 (1985)).

inferred from his tolerance and encouragement of harassment of plaintiffs)).  The

Second Circuit also stated in *Amnesty America*, that because a single action on the

part of a ***policymaker*** is sufficient to create a municipal policy, then "a ***single***

***instance of deliberate indifference to subordinates' actions can provide a basis for***

***municipal liability***." 361 F.3d at 127 (emphasis added).

Although plaintiff continues to state that he wrote a myriad of complaints to

defendants Middaugh and Paravati, there is no evidence of these letters or

complaints written directly to either of these defendants.  Defendant Paravati's name

appears simply to be sprinkled into plaintiff's amended complaint whenever he

mentions defendant Middaugh.  Defendant Paravati has submitted an affidavit

stating that he has received ***no*** correspondence from plaintiff, and although

defendant Paravati occasionally receives letters from inmates, he refers them to Chief

Deputy William Chapple, who is the chief administrator for OCCF. Paravati Aff. ¶ 2.

In his affidavit, defendant Paravati also states that he is not involved in the

development, drafting, revision, or issuance of policy and procedures regarding the

Corrections Division. Paravati Aff. ¶ 3.  Rather, defendant Paravati, as the

Undersheriff, is involved in the policy and procedures of the Law Enforcement

Division. *Id.*  Thus, even if plaintiff had sent a letter directly to defendant Paravati,

he would not have had the authority to change any of the policies or procedures

relating to the jail.

When a supervisor's involvement in an inmate's complaint is limited to

forwarding the correspondence to the appropriate staff, the supervisor has

insufficient personal involvement for liability in a section 1983 action. *Ortiz-Rodriguez v. N.Y. State Dep't of Corr. Servs*., 491 F. Supp. 2d 342, 347 (W.D.N.Y. 2007)(citing *inter alia Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997)(summary judgment affirmed where commissioner referred plaintiff's letter to the prison superintendent); *Liner v. Goord*, 310 F. Supp. 2d 550, 555 (W.D.N.Y. 2004)).  Even assuming that the defendant completely ignored an inmate's letter, it has been held that an official will not be personally involved in a constitutional violation simply because he ignored a letter of complaint. *Smart v. Goord*, 441 F. Supp. 2d 631, 642-643 (S.D.N.Y. 2006).

Thus, in this case, whether defendant Paravati ever received letters from plaintiff or simply failed to respond to those letters, plaintiff has failed to show personal involvement of this defendant.  He is also not a policy-maker for the OCCF. Based on the entire record, the entire complaint may be dismissed as to defendant Paravati.

Defendant Middaugh is the Sheriff of Oneida County. Middaugh Aff. ¶ 1.  In his affidavit, defendant Middaugh also states that he does not have any record of correspondence from plaintiff. *Id*. ¶ 3.  Defendant Middaugh also states that when he receives correspondence from an inmate, he forwards the matter to the Chief Deputy for action. *Id*.  Thus, if plaintiff did write to defendant Middaugh, and Middaugh ignored the letters or sent the letters elsewhere for resolution, he is still not *personally* responsible for the constitutional violation.

Plaintiff also claims, that defendant Middaugh allowed the unconstitutional

policies to continue.  This allegation is relevant for personal liability as well as for municipal liability as cited above.  Defendant Middaugh states in his affidavit that, as the Sheriff, he is "the authority for the policy and procedures of the Oneida County Sheriff's Office. Middaugh Aff. ¶ 4.  The policies are drafted by staff and are sent to defendant Middaugh for final signature. *Id.*  The OCCF policies and procedures are then issued by William A. Chapple, Chief Deputy. *Id.*

Although plaintiff in this case makes several claims, the only claims that relate to policies and procedures are the claim challenging his placement in deprivation status and the claim relating to the mental health care policy.  Although he claims that he wrote letters regarding his other claims, plaintiff does not actually claim that the other remaining constitutional violations that he allegedly suffered were caused by "policies."  Plaintiff alleges two assaults that were committed by individual officers, but does not allege that there was a "policy" of assaulting inmates or that defendant Middaugh was aware of such a policy.  He claims only two isolated instances of assault.  Plaintiff also claims that his medications were improperly withheld, and clearly that is an issue that plaintiff had with Dr. Kordylewska.  Thus, all claims may be dismissed as against defendant Middaugh in his individual capacity except the deprivation status claim.  Plaintiff's deprivation status may also be sustained as against Oneida County.[21]

---

[21] Plaintiff has named Oneida County as a separate defendant and therefore, does not need to name defendant Middaugh in his "official capacity". *See Crews v. County of Nassau*, 06-CV-2610, 2007 U.S. Dist. LEXIS 94597, *1-2 n.1 (E.D.N.Y. Dec. 27, 2007)(claims against defendants in their official capacity are duplicative of claims against the municipality).

9.    **Retaliation**

Any action taken by defendants in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Franco v. Kelly*, 854 F.2d 584, 588-90 (2d Cir. 1988).  In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for adverse action taken against him by defendants. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003)(citing *Gayle v. Gonyea*, 313 F.3d 677 (2d Cir. 2002); *Hendricks v. Coughlin*, 114 F.3d 390 (2d Cir. 1997)).  The court must keep in mind that claims of retaliation are "easily fabricated" and thus, plaintiffs must set forth non-conclusory allegations. *Id.* (citing *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001).

In this case, plaintiff does not move for summary judgment on the retaliation count (Count 8).  Defendants do not address retaliation in their motion for summary judgment.  However, some of the claims for retaliation are completely conclusory, and the court will recommend dismissing the claim against some of the defendants.

Plaintiff's main allegation is that after he filed grievances, all the defendants retaliated against him.  He claims that defendant Lieutenant Gabrielle Liddy retaliated against plaintiff for writing complaints against her. AC ¶ 122.  Defendant Liddy was responsible for placing plaintiff in deprivation status on December 6, 2004. Liddy Aff. ¶ 2.  Defendant Liddy states that plaintiff wrote a complaint to her, not about her, and she responded to the complaint on December 14, 2004. Liddy Aff.

37

¶ 8.

Plaintiff claims that the retaliation consisted of denying plaintiff writing materials and preventing him from writing grievances. AC ¶ 122.  It is actually unclear why plaintiff was placed on deprivation status.  Defendant Liddy's affidavit states that the incidents which led to this status being imposed are in Exhibit B. Liddy Aff. ¶ 3.  Exhibit B includes narrative reports of various incidents occurring between December 4 and December 6. Liddy Aff. Ex. B.  These incidents began with a December 4, 2004 incident in which plaintiff was found with another inmate's "Motrin." Liddy Aff. ¶ B.  Because he had been placed in deprivation status, all of his property was removed from his cell. Liddy Aff. Ex. C (deprivation order).  Legal materials were to be kept at an officer's desk and "given [to plaintiff] upon request." *Id.*

Plaintiff has not come forward with one complaint that he wrote ***about*** defendant Liddy.  Plaintiff alleges that defendant Liddy "retaliated" against plaintiff by not giving him writing materials and allowing him to write grievances. AC ¶ 122. Since plaintiff was on deprivation status, he did not have writing materials in his cell and had to request them.  Plaintiff does not cite one instance in which he was actually deprived of writing materials so that he was unable to write a grievance.

Plaintiff also states that defendant Liddy kept plaintiff in deprivation status "for no reason" and used that status as a way to keep plaintiff from contacting the courts. AC ¶ 123.  Plaintiff was kept in deprivation status until December 27, 2004. Liddy Aff. Ex. D.  The status was reviewed almost every day, and the order

reflecting this review shows that plaintiff was given access to his legal and religious materials on December 15, 2004. *Id.*  Thus, plaintiff's statement that defendant Liddy was using deprivation status to keep plaintiff away from the courts is completely unsupported.  Therefore, plaintiff's retaliation claims may be dismissed as against defendant Liddy. The court is only recommending dismissal of the ***retaliation claim*** against defendant Liddy.  The claim regarding plaintiff's challenge to his deprivation status should not be dismissed as against defendant Liddy.

Plaintiff also alleges retaliation as against defendant Heim. AC ¶ 125. Plaintiff states that defendant Heim completely ignored plaintiff and his grievances after November, once plaintiff's grievances were sent to the Commission of Corrections. *Id.*  It is unclear what plaintiff means by this statement, and he cites absolutely no specific instance in which defendant Heim "ignored" plaintiff's grievances after November of 2004.  Thus, plaintiff's claims of retaliation may be dismissed as against defendant Heim as completely conclusory.

Finally, plaintiff alleges that defendants Middaugh and Paravati retaliated against plaintiff by allowing their officers to abuse the policies and procedures of the facility. AC ¶ 126.  Plaintiff also claims that defendants Middaugh and Paravati were aware that plaintiff "wanted" to sue them, and they felt that "it would be in their best interest to try to keep Jacoby away from the courts . . . ." AC ¶ 127.  Plaintiff has no basis for this statement.  He claims that these defendants were retaliating against him for "constantly" writing them, however, there is not one letter in plaintiff's vast array of materials that is addressed to defendants Middaugh or Paravati.  Plaintiff's

statement that defendants Middaugh and Paravati "knew" that plaintiff "wanted" to sue them is simply not sufficient to show that they were "retaliating" against him for the exercise of his constitutional right to redress of grievances.  Thus, any claims of retaliation may be dismissed as against defendants Middaugh and Paravati.

The only claims of retaliation remaining are against defendants Carey and Breen relating to the cell and strip. AC ¶ 121.

## 10.   **Conspiracy**

A complaint that contains only conclusory, vague, or general allegations of conspiracy to deprive plaintiff of his constitutional rights cannot survive. *Walsh v. Goord*, 07-CV-246, 2007 U.S. Dist. LEXIS 38418, *18-20 (W.D.N.Y. May 23, 2007).  Plaintiff must allege facts sufficient to establish an agreement among the alleged conspirators. Id. (citing *Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir.), *cert denied*, 506 U.S. 819 (1992); *Salahuddin v. Cuomo*, 861 F.2d 40, 43 (2d Cir. 1988)).  In addition, mere conclusory allegations are insufficient to state a claim for violation of civil rights. *See Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987) (plaintiff may not set forth vague claims that "shock, but have no meaning).

In this case, plaintiff alleges that defendants Carey, Heim, Liddy, Middaugh, Paravati, Breen, Stock, Idzi, and Dr. Kordylewska all "got together" and discussed how they could "come up with lies and make up stories" about plaintiff. AC ¶¶ 131-32.  Plaintiff claims that these individuals conspired to bring false charges against him to "muddy up the waters . . . and hide their faults and liability." AC ¶ 132. Plaintiff then engages in a litany of allegations, purportedly showing that defendants

conspired, however, these facts are only a recitation of individual defendants' alleged adverse actions against plaintiff and in no way show that the individual defendants "conspired" with each other to injure plaintiff. *See* AC ¶¶ 133-48.  While some of the allegations may relate to possible claims of retaliation, they do not show that all the defendants "conspired" to deprive plaintiff of his constitutional rights. Thus, plaintiff's Count 9 may be dismissed ***as against all defendants***.

## CONCLUSION

As a summary to the above report, the court finds that Counts 1, 6, 7, and 9 should be dismissed in their entirety as against all defendants.  Count 3 should be dismissed to the extent that it claims a "failure to protect" because the rest of the claims in Count 3 are covered by Count 2 (mental health care) and Count 4 (excessive force).  The complaint may be dismissed in its entirety as against defendants Paravati, Heim, Stock, Idzi, and Stressel.

The Counts and defendants remaining should be as follows:

1.    Count 2: as against defendants Kordylewska; and Oneida County.

2.    Counts 3 and 4: as against defendants Breen and Heaney (Count 4 only the September 19, 2004 incident); and Carey (Count 3 for failure to intervene in the September 19, 2004 incident).

3.    Count 5: as against Breen and Heaney (unreasonable searches); Carey (deprivation orders); Liddy (deprivation orders); Middaugh and Oneida County.

4.    Count 8: as against defendants Breen and Heaney (Retaliation).

**WHEREFORE**, it is hereby

**RECOMMENDED**, that plaintiff's motion for partial summary judgment

(Dkt. No. 59) be **DENIED**, and it is

    **RECOMMENDED**, that defendants' cross-motion for summary judgment (Dkt. No. 67) be **GRANTED IN PART**, and that the complaint be **DISMISSED IN ITS ENTIRETY** as against defendants **PARAVATI, HEIM, STOCK, IDZI (YOLLA), and STRESSEL**, and it is

    **RECOMMENDED**, that Counts 1, 6, 7, and 9 be **DISMISSED IN THEIR ENTIRETY**, and Count 3 be dismissed to the extent that it claims a "failure to protect," and it is

    **RECOMMENDED**, that defendants' cross-motion for summary judgment (Dkt. No. 67) be **DENIED TO THE EXTENT THAT THE CLAIMS AND DEFENDANTS REMAIN AS STATED ABOVE**, and it is

    **ORDERED**, that a summons be re-issued for Defendant Kordylewska, and that the Marshal attempt ***personal service*** on this defendant.

    Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993)(citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: March 27, 2008

                                        _____

                                        Hon. Gustave J. DiBianco
                                        U.S. Magistrate Judge